Health. Thank you. We have just one case today, which is a makeup argument from the May 24 sitting, and that's in case number 21-551 M.A. v. Rockland County and Department of Health. And I understand counsel are present, and I can see both of you on the screen, so whenever you're ready, Mr. Sussman, we'll hear from you. May it please the court, thank you for the great courtesy you've given in adjourning this from the time I was on trial to today, and I do appreciate that. This is a very significant case in my view. It raises many, many issues. Let me give you a very brief overview of what we believe is involved. In 2018, New York State had a scheme which recognized religious and medical exemptions. It also had provisions by which, in the case of what was called an outbreak of a contagious disease, a school in which that quote-unquote outbreak occurred could curtail the attendance rights of those who had a religious or medical exemption. That was a compromise, as I understand it, which was wrought in order to provide an opportunity to deal with that contagious disease. There was also, of course, state regulations allowing quarantining of those who suffered from the contagious disease so as to stop its spread. In October of 2018, late September, early October, there was a quote-unquote outbreak of several cases of measles in the county. As relevant to this case, the people I represent attended a school in Chestnut Ridge called Green Meadow, a Waldorf school. A large number of those individuals had religious exemptions, which were then permitted under state law 2164-9 of the public health law. There were no outbreaks at all at that school, ever, through this entire time period. However, in early December, on December 3rd of 2018, the Commissioner of Health, Patricia Schnabel Rupert, entered an order which prohibited students who had the religious exemption from attending that school, which curtailed the right of attendance for approximately 130 students. Those students were only allowed back into school when I filed an injunctive action in state Supreme Court, which injunctive action actually challenged both that order and another order, an emergency executive order promulgated by County Executive Ed Day on March 26th of 2019. That order was directed plainly only at those who had religious exemptions, not those who had medical exemptions, and by its terms prohibited those individual children, not adults, from going outside of their home, literally, to assemble, to go to school, to go to parks, churches, synagogues, or anything else. We challenged that, as I mentioned, in state Supreme Court, had it enjoined specifically, and the court enjoined both operations of Schnabel Rupert's order and Day's order, and those children went back into school. Counsel, you're talking about your Article 78 proceeding, correct? That was by dint of an Article 78 proceeding, which challenged Mr. Day's executive order and Rupert Schnabel's order, yes, Your Honor. Why didn't you bring it after the first exclusion order or the second exclusion order? We brought it after the second, not the first. What occurred, Your Honor, is that there was a shifting field, and the school and the parents, as a group, made a decision to cooperate with the public health authorities for a period of time. However, initially, it was set at a 70 percent ceiling. Once you reach 70 percent vaccinations, children would be back in school. Enough parents did that, so it got to 70 percent. Then it got to 80 percent. Then it got to 95 percent. The parents in the school decided this was absurd and that what was happening was an attack on the religious exemption itself, not one motivated by public health, and that was vindicated later. Counsel, you prevailed in getting the emergency declaration rescinded, didn't you? Yes. What relief were you looking for? Money damages against those who promulgated unconstitutional orders. These orders were unconstitutional. They had no basis in either reality or law. Rupert Schnabel's order, in fact, Your Honor, was contravenes explicit law at a time when the county never sought to quarantine any sick person. They didn't do that until April 16th of 2019 after we succeeded in getting our injunction. There were methods available to them under state law to deal with the situation. But what really went on here is that motivated by Mr. Day's judge. Sorry. When you say that there were methods for them to deal with the situation, what are you referring specifically to? What's in your brief regarding quarantining infected individuals? Is that the only one of these other methods that you're talking about under state law, Your Honor, and regulations? The public health authority, that is the commissioner, Schnabel Rupert, had the authority to order a quarantine of those individuals who were ill. She did not do that. She did not do that until April 16th, 2019, which was seven months or eight months after the outbreak began. She did not do that until after we got an injunction against an order which was directed toward religious exemption alone, not medical exemption, entirely irrational, directed only at children, which was struck by state Supreme Court. So, yes, that's what we've been referring to when we say there are methods that were condoned by the by and have obviously widely been used since then, although that's not relevant really to this argument. Right. Although it is, I guess, you're acknowledging, though, that there is a public interest in addressing an outbreak of this kind in the Department of Health and the schools taking some type of action to address a situation such as an outbreak of an infectious disease. I'm acknowledging that there is and was a carefully constructed regulatory system in New York, which recognized religious exemptions at that time. They've, as you know, since been curtailed and abolished, recognized religious exemptions, gave those in power authority where there was an outbreak out of school to ban those who had the religious exemptions from that school. That was in place at the time. There's a regulatory structure that said that that was affirmed in Phillips. We're not challenging Phillips. However, this this edict went well beyond that. It used zip codes, which is an 11 mile long, 11 square mile construct, which has no relationship to reality. And it banned perfectly healthy children from a school where there was no outbreak. That was not contemplated by New York state law or regulation. And that's why it was ultra vires. There was no basis for it. So you're correct, Your Honor. And New York state certainly tried to deal with the issue anticipatorily. Mr. Day's edict was even more absurd, frankly. What it sought to do was to focus only on religious children. It did that from the perspective of a person who later argued, as the briefs show, that the religious exemption was self fraudulent. What he wanted to do was, by administrative edict, focus on those who had the religious exemption and essentially punish them. And as I've pointed out extensively in my brief, with no real contradiction, at the time there might have been two cases of measles in the county. That's in April, late March of 2019, when he promulgated his edict. The county repeatedly exaggerated the outbreak. And in my view, this is predicated on Mr. Day's animus, which was very well expressed to the religious exemption, which then and then existed in state law and needed to be respected. He had no right to ultra vires, simply disrespected because he didn't like it. The legislature eventually curtailed it in June. I understand that happened. But in the months we're talking about, there was no basis for either of these administrative actions. Can I just ask you, how should we or should we consider the significance of the fact that the legislature has made this change? Like a lot of your argument is based on, you know, assertions of animus, but also just the idea that this is an unreasonable distinction to make or it's inherently unreasonable not to allow this type of religious exemption. And so what do we make of the fact now that the legislature has said, actually, no, we're going to get rid of this all together? Or does that does that have any relevance? I believe, frankly, does no legal relevance to the case. Quite honestly, I think it's not a factor for you to consider. At the time that this matter was happening in real time and space, the legislature had held no hearings. I'm talking about now the state legislature, excuse me, had held no hearings on any legislation to curtail the religious exemption. There, in fact, were never any hearings. In June, on June 13th of 2019, both houses of the legislature, after the measles issue had largely been vitiated in this county, did what they did. And I don't believe that you can attribute anything to that. I think at the time they did what they did, these individuals weren't pioneers ahead of their time. They were people under the Masterpiece Cakeshop case who were using state action to oppress those who had religious beliefs. That's impermissible. That Supreme Court case in 2017 term makes extremely clear that administrative actions, legislative actions that are smitten with any religious animus is impermissible. And this clearly, when you look at what occurred and you look at the targeting involved, shows that. Look, if you look at day's order, you cannot construct a logic which would say that we're going to keep people who have medical exemptions out on the street. They can go anywhere they want, these children. And we're so concerned about this problem where there are two cases, really, in the whole county of 327,000 people. There are two cases. And we're going to have all the religiously exempt children at home. How can anyone make a logical basis for that? Not quarantining those who are sick for seven months. There's absolutely no logic to this. This is public health gone wild, quite honestly. And courts have to intervene when someone declares an emergency, when there is no emergency. This isn't Catanzaro where a building is falling down. That was my case. I know the case. That's not this case. This is not an emergency situation. You can't define this as a catastrophe, an emergency, or anything like that. And state court got that right. And the county essentially abandoned any defense. They say it's not precluded, their argument's not precluded, and it wasn't precluded in the district court. Why not? They went through to the appellate division, not only to Judge Cohen sitting as a single judge, but it was then referred to the whole appellate division, which considered it and rejected their argument and knew exactly what it was doing. It let the children back into school, and then they retrenched. Moreover, the emergency order was 30 days in duration. We have a statute, Executive Law 24, which gives them five days. This is not the kind of lawmaking or ad hoc administrative lawmaking that can pass any constitutional muster. And we have courts to step in. Whatever one's sympathy with those trying to fight measles, I get it. But there were ways to do it, and those ways were eschewed, repudiated, and not followed. Can I just, I'm sorry, if I could just ask one more question? Please. You're in court. Welcome to the court, and congratulations on your appointment. Thank you. I don't want to prolong it for my colleagues if they're ready. But just on that last point you made regarding Executive Law 24 and the five-day limitation. Now, isn't there another provision in that that does permit a 30-day, proclamations of 30 days to be extended? I wasn't clear on that, but in the briefs, you talk about a five-day limit in Section 24. But in that same section, isn't there a provision that talks about proclamations of 30 days? It permits extensions, as we understood it, up to 30 days. And those extensions could be granted if the emergency condition obtained and persisted. But I think, frankly, that goes to demonstrate where a condition starts to obtain in late September and is not accelerated but is now on its downward trajectory, how absurd the declaration of emergency is, whatever one's perspective is five or 30 days. If you look at the empirical evidence available, if anyone was sincere about calling this an emergency, it might have been an emergency in November or December. It wasn't, but maybe it could have been so construed. But by April, late March, there's no empirical basis for this. And I understand that courts defer to an extent to the decisional making. But here, you have profound contradictions between the county executive who claimed he was informed by the health commissioner with regard to this edict itself and the health commissioner, if you read my brief, which I'm sure you've done in these supporting depositions, who claimed she was on vacation, not involved, had nothing really to do with it. So how, again, this has other animus. And this, again, is a summary judgment motion. This has other animating intentions, which are clear to me, and they certainly could be made clear to a jury. I'm way over time. I apologize to you all. Thank you for your courtesy. Thank you, Mr. Sussman. We'll hear from the appellee, Ms. Faden. You're on mute. You're muted. Thank you. Good afternoon. My name is Lorraine Faden. I'm an assistant Rockland County attorney. I represent the defendants' appellees. What I'm hearing from Mr. Sussman is nothing more than ad hominem attacks against Dr. Rupert. They do not address her authority to make these rules regarding children in elementary schools. There can be no question the district court took judicial notice. The fact that there was an epidemic in Rockland County of the measles. As a noun, an epidemic is defined as an outbreak of disease that spreads quickly and affects many individuals at the same time. I believe that the court should give no import to Mr. Sussman's contention that there was no emergency and that there was no epidemic. Dr. Rupert was charged by the State Department of Health with controlling the measles outbreak. You know, you can't go back in hindsight and say what she should or should not have done. I mean, we learned a lot from the COVID-19, which occurred on the heels of the measles epidemic. But the measles was a serious and terrible emergency at the time that it was happening. Could I ask you about the medical exemptions? The school exclusion orders didn't have those, if I'm understanding correctly. But the emergency declaration did. And can you explain the genesis of that? Yes. So in order to accomplish herd immunity with respect to measles or COVID or any other disease, you need to get a certain percentage of the population vaccinated. There's always going to be people who cannot get vaccinated because of medical reasons. But if you have herd immunity, then those otherwise compromised people who cannot be vaccinated are protected. So why was that part of the school exclusion earlier on? Because the children that couldn't be vaccinated for medical reasons could not be vaccinated. I understand there was a medical exemption in place at the time. I do want to point out that I think the fact that it was struck down shortly thereafter speaks volumes. I know that it existed at the time. But if the children who could be vaccinated without having a medical reason not to do so, if they were vaccinated, then we could get to the point where there would be herd immunity like they did in the Green Meadow High School. Maybe I'm misunderstanding what happened here, but I thought that the school exclusion orders did not have the medical exemption and that they were added for the emergency declaration. And that's what I'm trying to understand. No, the schools were ordered by Dr. Rupert to temporarily exclude from attendance any student who could not provide proof of vaccination, including those with religious or medical exemptions. The orders required that the excluded students stay home until 21 days after the last exposure in the school. Okay, what are you reading from? I'm actually reading from my own notes, Your Honor. Okay. But let me let you know where it is in an hour brief. Well, let me, I guess, broaden out then to, I guess, the bigger question is that I have is that is there any, what is the rationale for, well, let me ask it differently. Is there any evidence that children who aren't vaccinated due to a medical exemption are less likely to spread measles than children who aren't vaccinated because of a religious exemption? Not that I know of, Judge, but that's not the point. That's what I was trying to explain with the herd immunity. Well, why isn't that the point? Isn't the purpose to stop the spread of measles? Well, of course, but if you can't, if you're immunocompromised, you have cancer or there's a medical reason why you can't be vaccinated, you don't want to get vaccinated and die. So now, I'm sorry, I switched over to the emergency declaration. Yes. So in the emergency declaration, the emergency declaration excluded people from gathering unless they were vaccinated. But it allowed an exemption for unvaccinated children with medical exemptions. That is correct. But not religious. And I guess I don't understand how that is consistent with the purpose of stopping the spread of measles. Well, like I said, it was consistent with the purpose because the children who couldn't, like I said, be vaccinated because it could hurt them or kill them, the emergency declaration did not apply to them. It applied to children with religious exemptions who could medically get vaccinated. Well, I guess I have a concern about that because I don't understand why, if somebody is unvaccinated and they're excluded, only for one reason why they're not vaccinated, but not another. Yes, that's what it, yeah, I mean, that's what it said because of what I was saying that the people who could be vaccinated should have been vaccinated. Let me, let me, I think I'm not being clear. Children who aren't vaccinated for medical exemptions are still contagious or still have the potential to spread measles. I'm sorry. Yeah, they could get it. Yes. And yet those children were not subject to the emergency declaration. Stop there. Correct. That, that is correct, your honor, and like I said, the reason is, I don't know how, what other way I can say it, the, the more people that are vaccinated, the more we're on the path to obtain herd immunity. So, if people cannot get vaccinated, because it'll hurt them, then it doesn't, it didn't apply to them. But it did apply to those who had religious exemptions, who could be vaccinated, but for their parents. So called religious beliefs. Okay, thank you. You're welcome. So, I would say, so I would just finish by saying that I don't think that it's fair to second guess. Dr Rupert's orders and conduct during the time of an emergency. You know, Mr Sussman places great weight on his opinion that quarantine should have been used and I'll tell you why quarantine wasn't used because we didn't have the staff at the time. We needed to hire people. The State Department of Health sent us a whole bunch of people. I think, like, 40 people to help us out, because quarantining, which we learned during and also, you know, at the end of the measles is requires contact tracing and you need contact tracers. And they need to be, they need to take a class and be certified in order to be contact tracers, pursuant to the State Department of Health. So, that is why at the beginning of the measles epidemic, the county didn't use quarantine. And I go back briefly to the school exclusion orders. How are the schools chosen for those you'd mentioned, you know, the sort of steps for vaccination status, but I'm wondering if you could point me to like how they were selected. Yes, of course, the schools were selected pursuant to advice from the State Department of Health by zip code. And there were two zip codes in Rockland County that experienced the worst of the measles during the time period in question. And those were, I believe, 10952 and 10977. They were in New Square and Muncie, which happened to be predominantly Hasidic Jewish and Orthodox Jewish. So, within those zip codes then, how were the schools chosen? It was one by one, right? They got calls. It was all the schools in the zip code where Green Mountain School happened to be located. Okay, and the zip code reflected a, there was a number, it was by number of infections within a zip code and then all the schools within that zip code? Yeah, but basically the state took a map and, you know, then narrowed it down to a map of Rockland County because there has to be some kind of empirical way to do this. And the zip codes, yes, they were 10977 and 10952. That mapping technology was able to identify the geographic concentrations of confirmed cases. And like I said, those, we got them from State Department of Health. It came down from them. They use that mapping technology. Okay, and so you're, it sounds like you're saying that all the schools within a certain distance from or within a certain zip code were treated equally. That is correct. Okay. I will say that, forgive me if I said this already, but I will say that the district court, Judge McCarthy took judicial notice of the fact that an epidemic was present. I will say she did speak to Judge Thorson's April 5th, 2019 order and discussed its flaws, as did the Supreme Court Kings County and CF versus New York City Department of Health and Mental Hygiene. That spoke to the decision, Judge Thorson's decision in Rockland County, where the court just looked at the overall percentage of the population, because that's not how you determine, as Mr. Sussman would have this court to believe, that's not how you determine epidemic. There was no hostility toward religion at all. That's absurd. Green Mountain School is not even a religious school. So to accuse the county exec and the health commissioner of religious animus is just, there's no, there's no, nowhere in law or fact that you can find that. And I think that's it. Thank you, judges. If you have no further questions, I would rest on my brief. Thank you, counsel. Judge Fuller. No. Mr. Sussman, you reserve two minutes for rebuttal. Thank you, Your Honors. Saying that people who have religious exemptions are fraudsters demonstrates animus to religion. Counsel's comment here, so-called religious exemption manifests the same attitude, which was manifested by both the county executive and the individual health commissioner who went to Albany immediately thereafter in the same month and proclaimed all sorts of hostility to those who had religious exemptions. To say that it's absurd is not factual. It was, it is factual that they had that animus. That was after, excuse me, that was after he had issued the emergency declaration, wasn't it? He didn't say it before. It was the same month, Your Honor. It's, I mean, it's parsing it a little close. It's clearly informing his attitude through the whole period. When counsel says that they didn't do a quarantine because he didn't have staff, the record shows that they made no request to do a quarantine. They had no discussion about a quarantine and that quarantines are not something that Sussman pulled out of the hat. It's in the state regulation that when you have a quote unquote outbreak, you do a quarantine, which they didn't do. We have thousands of emails with the state. They never requested assistance in this period of time so that they could in fact implement if they were short staffed, any kind of quarantine. The fact is, this was not an epidemic. It was an outbreak confined to an insular, to go to your point, Judge Park, to an insular religious minority. There was never any indication that it had spread beyond that Hasidic community. That Hasidic community is in one side of the zip code in New Square in Muncie. It's far distinct from Chestnut Ridge where my clients were. To use a zip code as a basis for this is frankly no justification in public health. They moved from zip code to five miles after a while. Again, there was no justification for it whatsoever. To answer the question that you posed, Judge Park, the fact is that the targeting of the religious population makes this a non-neutral emergency order, to use the language of Fulton and its progeny. It's clear this was not directed generally and to the point that, well, those who had the medical exemption needed to be respected and allowed to move around. It makes no sense. If there was an emergency and you were going to issue a quarantine for healthy people, you would have asked those who had the medical vulnerability to stay home so they wouldn't get it and then spread it. It just doesn't make any sense. The only other point I want to make regards to herd immunity, council gave arguments on herd immunity, which frankly have no basis in anything. Herd immunity with regard to measles is supposed to be approximately 85 to 90% of the population. It's a population-centric concept. That's what herd immunity is. In this county, at this period of time, herd immunity for measles was over 92%. They had already reached herd immunity. The community which did not have that was this Hasidic community, and in that Hasidic community, as I say, they should have never issued the state-sanctioned quarantine. Thank you for your attention, and I appreciate the opportunity to argue before you, and again, welcome Judge Lee. Thank you. Thank you both. We'll take the case under advisement. I'll ask the courtroom deputy to adjourn. Thank you, judges. Thank you. Thank you, judges. I'll transfer you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.